UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 05-23105-CIV-O'SULLIVAN

[CONSENT]

BROWARD MARINE, INC., et al.,

      Plaintiffs,

v.

S/V ZEUS,

      Defendant.
_____/

BROWARD MARINE, INC., et al.,

      Supplemental Plaintiffs,

v.

MARINA FUNDING GROUP, INC., et al.,

      Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER comes before the Court pursuant to proceedings supplementary commenced by the supplemental plaintiffs, BMI Investment Group, LLC and BME Investment Group, LLC (collectively "Broward Marine"). This matter was referred to the undersigned by the Honorable Paul C. Huck in accordance with 28 U.S.C. § 636(b). See Order of Reference to Magistrate Judge (DE# 130, 12/23/08). The parties have consented to the jurisdiction of a United States Magistrate Judge. See Consent to Exercise of Jurisdiction by a United States Magistrate Judge (DE# 17, 8/9/07). The Court presided over an evidentiary hearing on December 17, 2009 and carefully reviewed the applicable filings and the law, the testimony and Exhibits 1 through 65 admitted at the evidentiary hearing and makes the following findings and conclusions:

## FINDINGS OF FACT

### Background

1.      This action arose out of a non-recourse promissory note secured by a first ship's preferred mortgage on the S/V Zeus (hereinafter "Zeus").

2.      When defendant Double Eagle Yachts, Inc. (hereinafter "Double Eagle") failed to pay the non-recourse promissory note at maturity, Broward Marine[1] filed the instant action to foreclose the first ship's preferred mortgage.

3.      Following a bench trial, the Court issued an oral ruling on February 9, 2006 finding in favor of Broward Marine and against Double Eagle and reserved ruling on attorney's fees and costs.

4.      On February 16, 2006, the Court entered a Final Judgment foreclosing the first ship's preferred mortgage. See Final Judgment (DE# 71, 2/16/06).

5.      The Zeus was later sold at a Marshal's sale. The sale was confirmed by Court order on March 10, 2006.  See Order Confirming Sale (DE# 79, 3/10/06).

6.      On March 15, 2006, Broward Marine filed a motion for attorney's fees and costs. See Plaintiffs' Verified Motion to Tax Attorneys' Fees and Costs and Memorandum in Support Thereof (DE# 84, 3/15/06).

7.      The Court did not award attorney's fees to Broward Marine due to the non-recourse nature of the promissory note and first ship's preferred mortgage, but granted in part costs. See Order Adopting Report and Recommendation (DE# 115, 3/25/08).

---

[1] The suit was commenced by Broward Marine, Inc. and Broward Marine East, Inc. and subsequently taken over by the supplemental plaintiffs, BMI Investment Group, LLC and BME Investment Group, LLC. In this Order, the Court will refer to all four entities as "Broward Marine."

2

8.      On March 28, 2008, the Court entered a Final Judgment of costs (hereinafter "costs judgment") in favor of Broward Marine and against Double Eagle in the amount of $67,302.77, plus statutory interest. See Final Judgment Awarding Costs (DE# 117, 3/28/08).

9.      Broward Marine sought to collect on its costs judgment by taking discovery in aid of execution. The discovery undertaken by Broward Marine revealed that Double Eagle had no assets.

10.     The discovery also revealed that Double Eagle made certain payments to Burrell Industries, Inc. (hereinafter "Burrell"), Marina Funding Group, Inc. (hereinafter "MFG") and attorney Larry Zink prior to the date of the costs judgment.

11.     The entire costs judgment remains outstanding.

**The Defendant and Supplemental Defendants**

       **A.      Double Eagle**

12.     Double Eagle is a Florida corporation with its principal place of business in Glenn Straub's residence.

13.     Mr. Straub is president and current sole shareholder of Double Eagle.

14.     Mr. Straub and his family members were at all times controlling shareholders of Double Eagle.

15.     In its 2005 tax returns, Double Eagle reported its total assets as $3,202,780.

16.     In its 2006 tax returns, Double Eagle reported its total assets as $0 and a net loss of $3,185,694, the estimated value of the Zeus (described as "Yacht Removed from Inventory").

17.     In its 2007 tax returns, Double Eagle reported its total assets as $0.

18.   Double Eagle's tax returns for 2006 and 2007 reflect loans from shareholders in the amount of $4.69 million.

**B.   Burrell**

19.   Burrell is a West Virginia corporation with its place of business in Ohio.

20.   Mr. Straub is president of Burrell.

21.   Mr. Straub and his family members were at all times controlling shareholders of Burrell.

22.   Burrell owns no real estate in Florida and maintains no offices in Florida.

23.   Attorney Craig Galle is the corporate secretary for Burrell and resides in Florida.

24.   In November 2000, Burrell was sued in Florida by the Village of Wellington because certain construction equipment, displaying Burrell's name, was blocking road construction and underground utility relocation.

25.   In that lawsuit Burrell admitted that it owned various construction equipment including dump trucks, front-end loaders, ditch witch trenchers and blazer trucks.

**C.   Larry Zink**

26.   Larry Zink is licensed to practice law in Florida and Ohio.

27.   Mr. Zink has a law practice in Florida and Ohio.

28.   Mr.  Zink has been Mr. Straub's friend and attorney for approximately 30 years.

29.   Mr.  Zink has served as counsel for Mr. Straub and his related entities, including Double Eagle, in various proceedings.

30.   Mr. Zink's normal hourly rate on Mr. Straub's cases was $185.

**D.   MFG**

31.   MFG is a Florida corporation with its principal place of business in Mr. Straub's

residence.

32.     Mr. Straub is president of MFG.

33.     Mr. Straub and his family members were at all times controlling shareholders of MFG.

**The State Court Action**

34.     In 2001, Double Eagle filed a lawsuit against various third parties styled as Double Eagle Yachts, Inc. v. Consolidated Yachts Corporation, et al., Case No. 01-10003 CA 20, Miami-Dade County Circuit Court (hereinafter the "State Court Action").

35.     In that action, Double Eagle sought damages sustained by the Zeus after various contractors miscalculated the depths of the Miami River and damaged the vessel by dragging it through the mud and rock on the river basin for almost a mile.

36.     Double Eagle was represented by multiple attorneys including Larry Zink. Mr. Zink represented Double Eagle at an hourly rate of $185. There was no contingency agreement between Mr. Zink and Mr. Straub in the state court action.

37.     In November 2005, Double Eagle settled its claims against Resolve Towing in the amount of $65,000.

38.     On March 20, 2006, Double Eagle obtained a settlement from defendant Consolidated Yacht Corporation in the amount of $65,000.

39.     On April 19, 2006, Double Eagle obtained a settlement from defendant Southern Yacht Surveyors in the amount of $200,000.

40.     Double Eagle used the settlement proceeds received from Consolidated Yacht Corporation and Southern Yacht Surveyors to pay $173,994.21 to MFG and $72,500 to Mr. Zink.

**Burrell's Loan to Double Eagle**

41.     On December 31, 1993, Burrell loaned $1,000,000 to Double Eagle. Pursuant to the express terms of the promissory note, the loan was made in Ohio and the loan was to be repaid by Double Eagle to Burrell in Ohio.

42.     Double Eagle made no payments on the loan for approximately twelve years.

43.     Burrell never made a demand for payment on the note.

44.     On February 16, 2006, the day after the Court issued the Final Judgment, Double Eagle made a $68,763.40 payment to Burrell as partial repayment of the $1,000,000 loan.

45.     The $68,763.40 payment did not discharge or fully satisfy the $1,000,000 loan.

46.     The $68,763.40 payment cleared out Double Eagle's bank account.

47.     At the time Double Eagle made the $68,763.40 payment to Burrell, Double Eagle knew that it would be subject to a costs judgment in favor of Broward Marine.

**MFG's Loan to Double Eagle**

48.     On December 31, 1994, Mr. Straub loaned $600,000 to Double Eagle pursuant to a written Promissory Note.

49.     On January 2, 2003, the $600,000 Promissory Note was assigned by Mr. Straub to MFG.  At the time Double Eagle had not made any interest or principal  payments on the note.

50.     On March 20, 2007, Double Eagle repaid a portion of the $600,000 loan when it paid MFG $173,994.21.[2]

_____

[2] The $173,994.21 payment was made from Mr. Zink's trust account to MFG at the direction of Glenn Straub.

6

51.    MFG never made a demand for payment on the note.

52.    The $173,994.21 partial payment did not discharge or fully satisfy the $600,000 loan.

**Payment Made to Attorney Larry Zink**

53.    On October 31, 2006, Mr. Zink made a $72,500 payment from his trust account to Tzangas, Plakas, Mannos & Raies, an Ohio law firm.

54.    This payment was made at the direction of Mr. Straub.

55.    The payment was made as a settlement of the claims against Mr. Zink who was a defendant in an Ohio lawsuit involving Mr. Straub and his family members.

56.    Double Eagle was not a party to the Ohio lawsuit and received no benefit in paying the $72,500 to Mr. Zink.

57.    Mr. Zink was not entitled to the $72,500 as a contingency fee for his work in the state court action.[3]

---

[3] Mr. Straub testified that in the state court action he had an agreement with Mr. Zink wherein Mr. Straub would pay Mr. Zink a reduced hourly rate of $185 plus a contingency fee of 30 to 40 percent. The contingency fee agreement was not reduced to writing. According to Mr. Straub and Mr. Zink the $72,500 was Mr. Zink's contingency fee. The Court does not find Mr. Straub and Mr. Zink's testimony credible in this respect. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.'"). The summary of Mr. Zink's trust account does not indicate that the $72,500 was a contingency fee payment. The Court notes that $72,500 out of the $265,000 settlement in the state court action comes out to approximately 27 percent, not the alleged 30 to 40 percent contingency fee testified to by Mr. Straub. The purported contingency fee was not paid at the time of the settlements with Consolidated Yacht Corporation and Southern Yacht Surveyors but approximately six months later in October 2006. Additionally, Mr. Zink did not receive a contingency fee percentage of the $65,000 settlement with Resolve Towing in the state court action. The Court further notes that Mr. Zink's hourly rate in the instant action, where there was no contingency, was also $185 an hour. In fact,

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1.      Broward Marine is a Florida corporation.

2.      Double Eagle is a Florida corporation.

3.      Glenn Straub is a Florida resident.

4.      MFG is a Florida corporation.

5.      Larry Zink is admitted to the Florida bar and has a Florida law practice.

6.      Burrell is subject to personal jurisdiction in Florida, as the alter ego of Mr. Straub.

See discussion, infra.

7.      The parties do not dispute that venue properly lies in the Southern District of

Florida.

### Proceedings Supplementary

8.      The Court has jurisdiction over these proceedings supplementary.

9.      "[T]here are two jurisdictional prerequisites for proceedings supplementary: (1) a

returned and unsatisfied writ of execution; and (2) an affidavit averring that the writ is

valid and unsatisfied, along with a list of third persons to be impleaded." Mejia v. Ruiz,

985 So. 2d 1109, 1112 (Fla. 3d DCA 2008) (citing Tomayko v. Thomas, 143 So.2d 227,

229-30 (Fla. 3d DCA 1962)).

10.      "Once these jurisdictional criteria are met, the 'statute should be given a liberal

construction so as to afford to the judgment creditor the most complete relief possible.'"

---

several invoices reflected a $185 hourly rate in cases where Mr. Zink did legal work for
Mr. Straub or his companies. Thus, the Court finds no credible evidence that Mr. Zink
was entitled to a contingency fee in the state court action.

Id. (citing Richard v. McNair, 121 Fla. 733, 164 So. 836, 840 (1936)).

11.     Broward Marine has attested to a returned and valid unsatisfied writ of execution

and provided a list of third parties to be impled. See Writ of Execution (DE# 125,

12/8/08); Affidavit (DE# 127-1, 12/19/08); Plaintiffs' Motion to Commence Proceedings

Supplementary and to Implead Third Parties and Memorandum in Support (DE# 126,

12/19/08).

12.     The Court impled third parties Glenn Straub, Burrell, MFG and Larry Zink on

March 19, 2009. See Order Commencing Proceedings Supplementary to Execution and

Impleading Third Parties (DE# 136, 3/19/09).

**Personal Jurisdiction Over Burrell**

13.     To determine whether this Court has personal jurisdiction over Burrell, the Court

must undertake a two-part analysis. Sculptchair v. Century Arts, Ltd., 94 F.3d 623, 626

(11th Cir. 1996). The Court must:

> [f]irst, . . . determine whether the Florida long-arm statute provides a basis
> for personal jurisdiction. If so, then [the Court] must determine whether
> sufficient minimum contacts exist between the defendant[ ] and [Florida]
> so as to satisfy "traditional notions of fair play and substantial justice"
> under the Due Process Clause of the Fourteenth Amendment.

Sculptchair, 94 F.3d at 626 (citing Robinson v. Giamarco & Bill, P.C., 74 F.3d 253, 256

(11th Cir. 1996) (quoting International Shoe v. Washington, 326 U.S. 310, 316 (1945)

(quotation omitted)). Both prongs must be satisfied for personal jurisdiction to exist.

Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

14.     The plaintiff has the initial burden of making a prima facie showing of personal

jurisdiction. See Cable/Home Communication Corp. v. Network Productions, 902 F. 2d

829, 255 (11th Cir. 1990). The burden then shifts to the defendant to challenge the

plaintiff's allegations by affidavits or other pleadings. See Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000). If the defendant meets its burden, the plaintiff must substantiate the jurisdictional allegations in its complaint by affidavits or other competent proof, and may not merely rely upon the factual allegations set forth in the complaint. Posner v. Essex Insurance Co., 178 F.3d 1209, 1215 (11th Cir. 1999).

15.     Where the plaintiff's evidence and defendant's evidence conflict, all reasonable inferences must be construed in favor of the plaintiff. Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006).

### A.     Specific Jurisdiction

16.     Florida's long-arm statute states, in pertinent part, that:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

> > (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

Fla. Stat. § 48.193(1)(a).[4]

---

[4] In addition to the specific jurisdiction provisions contained in section 48.193(1), Florida's long-arm statute provides for general jurisdiction where "[a] defendant . . . is engaged in substantial and not isolated activity within [Florida]." Fla. Stat. § 48.193(2). "The continuous and systematic general business contacts sufficient to confer general jurisdiction present a "much higher threshold" than those contacts necessary to support specific jurisdiction under section 48.193(1)." Trustees of Columbia University in the City of New York v. Ocean World, S.A., 12 So. 3d 788, 792 (Fla. 4th DCA 2009) (citing Seabra v. Int'l Specialty Imports, Inc., 869 So.2d 732, 734 (Fla. 4th DCA 2004)).  The Court finds no basis for exerting general jurisdiction over Burrell.

17.     Relevant, but not dispositive, factors the Court should consider in determining whether Burrell is "carrying on a business" in Florida pursuant to section 48.193(1)(a) "include the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." Horizon Aggressive Growth, LP. v. Rothstein-Kass, PA, 421 F.3d 1162, 1167 (11th Cir. 2005) (internal citations omitted).

18.     Burrell has no office in Florida, does not possess or maintain a license to do business in Florida and does not serve any clients or generate revenue in Florida.

19.     Although two of Burrell's officers, Mr. Straub and Mr. Galle, are Florida residents, there is no evidence that Burrell transacted business in Florida after the year 2000.

20.     There was evidence that Michael Waldo worked for all of Mr. Straub's companies, including Burrell. However, there was no evidence that Mr. Waldo performed work for Burrell in Florida. Mr. Waldo resides in Ohio and has spent some summers in Florida living above the garage in Mr. Straub's residence and working odd jobs for Mr. Straub.

21.     Burrell's activities as evidenced by the 2000 Complaint filed by the Village of Wellington do not meet the requirements for specific jurisdiction contained in section 48.193(1)(a) of the Florida Statutes.

22.     To invoke specific jurisdiction under section 48.193(1)(a), the activities of the defendant "must be considered collectively and show a general course of business activity in the state for pecuniary benefit." Horizon Aggressive Growth, 421 F.3d at 1167 (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F. 3d 1247, 1249 (11th

11

Cir. 2000)).

23.     In November 2000, Burrell was sued by the Village of Wellington because in September 2000 some of Burrell's construction equipment was blocking an easement. There is no evidence that Burrell conducted business in Florida since then.

24.     This isolated incident in 2000 is insufficient to support a finding that Burrell engages in "a general course of business activity in the State [of Florida] for pecuniary benefit." Id. Additionally, there is no "connexity" between the activities surrounding the 2000 lawsuit and the instant case. See Canale v. Rubin, 20 So. 3d 463, 466 (Fla. 2d DCA 2009) (noting that "[s]pecific jurisdiction . . . requires a causal connection between the defendant's activities in Florida and the plaintiff's cause of action, a requirement known as 'connexity.'").

### B.     Due Process

25.     In addition to establishing jurisdiction under Florida's long arm statute, the plaintiffs must also show that sufficient minimum contacts exist between Burrell and Florida so as to satisfy "traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. Sculptchair, 94 F.3d at 626 (citation omitted).

26.     It does not appear that Broward Marine would be able to satisfy this prong. Burrell does not have sufficient minimum contacts with Florida and would not reasonably anticipate being haled into Court in Florida based on the facts presented to this Court. The Court does not reach this constitutional issue, however, because the plaintiff has not shown that Burrell would be subject to Florida's long arm statute.

### C.   Alter Ego Jurisdiction

27.    Burrell may be subject to personal jurisdiction if it is the alter ego of Glenn

Straub, a Florida resident. See Bellairs v. Mohrmann, 716 So.2d 320, 322 (Fla. 2d DCA

1998); Merkin, M.D. v. PCA Health Plans of Florida, Inc., 855 So.2d 137, 141 (Fla. 3d

DCA 2003).

28.    "The alter ego theory of long-arm jurisdiction exists as a limited exception to the

general, two-step process of establishing long-arm jurisdiction." Bellairs v. Mohrmann,

716 So.2d 320, 322 (Fla. 2d DCA 1998).

29.    To pierce the corporate veil under Florida law, "a plaintiff is required to prove

both that the corporation is a mere instrumentality or alter ego of the defendant and that

the defendant engaged in improper conduct" in the formation or use of the corporation.

Priskie v. Missry, 958 So.2d 613, 614-15 (Fla. 4th DCA 2007) (citation and internal

quotation marks omitted). "It matters not that the improper conduct occurred after the

formation of the corporation." Bellairs, 716 So.2d at 323.

30.    In Florida, the corporate veil will be pierced only in exceptional circumstances,

such as for fraud or where the corporation is formed for some illegal purpose. "Improper

conduct is present only in cases in which the corporation was a mere device or sham to

accomplish some ulterior purpose . . . or where the purpose is to evade some statute or

to accomplish some fraud or illegal purpose." Johnson Enterprises of Jacksonville, Inc.

v. FPL Group, Inc., 162 F.3d 1290, 1320 (11th Cir. 1998) (citation and internal quotation

marks omitted); Lipsig v. Ramlawi, 760 So.2d 170, 187 (Fla. 3d DCA 2000) (noting that

"unless there is a showing that a corporation was formed, or at least employed, for an

unlawful or improper purpose - as a subterfuge to mislead or defraud creditors, to hide

assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced.").

31.     Mr. Straub was the controlling shareholder of both Double Eagle and Burrell.

32.     Mr. Straub used his companies, including Burrell, to finance the operations of his other companies including Double Eagle.

33.     Mr. Straub did not maintain the corporate formalities among his various companies as evidenced by the fact that Michael Waldo, although an employee of Burrell, performed work for all of Mr. Straub's companies.[5]

34.     Here, Mr Straub clearly utilizes his entities interchangeably. Mr. Straub transfers money between his entities at will. By doing so, he attempted to defraud creditors and prevent their collection of any monies due.

35.     The Court finds that Burrell has been used by Mr. Straub for an improper purpose, to thwart legitimate, non-insider creditors of Double Eagle.

36.     Burrell is accordingly subject to personal jurisdiction in Florida as the alter ego of Mr. Straub.

**Fraudulent Transfers**

37.     Florida Law governs proceedings supplementary in the instant case. Rule 69(a)(1) of the Federal Rules of Civil Procedure states, in part, that:

_____

[5] Mr. Waldo testified in another matter that he was formally employed by "Burrough Industries." See Transcript (DE# 160-1 at 15, 11/18/09). It is unclear whether Mr. Waldo testified that he worked for Burrell Industries and it was mistakenly transcribed as "Burrough" or if Mr. Straub has another company named "Burrough Industries." Mr. Straub acknowledged at the evidentiary hearing that Mr. Waldo worked for Burrell but was uncertain of the time frame. However, it is abundantly clear that Mr. Waldo was formally employed by one of Mr. Straub's companies but worked for all of Mr. Straub's companies. Id.

[t]he procedure on execution--and in proceedings supplementary to and in aid of judgment or execution--must accord with the procedure of the state where the court is located . . . .

Fed. R. Civ. P. 69(a)(1).

38.     Section 56.29, Florida Statutes, states in part as follows:

(1) When any person or entity holds an unsatisfied judgment or judgment lien obtained under chapter 55, the judgment holder or judgment lienholder may file an affidavit so stating, identifying, if applicable, the issuing court, the case number, and the unsatisfied amount of the judgment or judgment lien, including accrued costs and interest, and stating that the execution is valid and outstanding, and thereupon the judgment holder or judgment lienholder is entitled to these proceedings supplementary to execution.

*       *       *

(5) The judge may order any property of the judgment debtor, not exempt from execution, in the hands of any person or due to the judgment debtor to be applied toward the satisfaction of the judgment debt.

(6)(a) When, within 1 year before the service of process on him or her, defendant has had title to, or paid the purchase price of, any personal property to which the defendant's spouse, any relative, or any person on confidential terms with defendant claims title and right of possession at the time of examination, the defendant has the burden of proof to establish that such transfer or gift from him or her was not made to delay, hinder, or defraud creditors.

(b) When any gift, transfer, assignment or other conveyance of personal property has been made or contrived by defendant to delay, hinder or defraud creditors, the court shall order the gift, transfer, assignment or other conveyance to be void and direct the sheriff to take the property to satisfy the execution. . . .

Fla. Stat. § 56.29.

39.     The manner in which a defendant in proceedings supplementary may prove that the judgment debtor's transfer made within one year before service of process was not fraudulent as to creditors is governed by case law and Florida's

15

Uniform Fraudulent Transfer Act (hereinafter "UFTA"), Fla. Stat. § 726.101, et

seq. Morton v. Cord Realty, Inc., 677 So. 2d 1322, 1324 (Fla. 4th DCA 1996)

(trial court should apply the Uniform Fraudulent Transfer Act and case law on

fraudulent transfers to determine whether a judgment debtor's transfer was

fraudulent as to creditors).

40.     Section 726.105 of Florida's Uniform Fraudulent Transfer Act states, in

part, as follows:

> (1) A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or after
> the transfer was made or the obligation was incurred, if the debtor
> made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the
> debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for
> the transfer or obligation, and the debtor:
>
> 1. Was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction; or
>
> 2. Intended to incur, or believed or reasonably should have believed
> that he or she would incur, debts beyond his or her ability to pay as
> they became due.

Fla. Stat. § 726.105 (1).

41.     "Because of the difficulty in proving actual intent . . .  the UFTA look[s] to indicia

of intent commonly known as 'badges of fraud.'" Amjad Munim, M.D., P.A. v. Pulmonary

and Critical Care Associates of Ft. Lauderdale, P.A., 648 So. 2d 145, 152 (4th DCA

1994).  Section 726.105 (2) sets forth a non-exhaustive list of "badges of fraud" that

may give rise to a

presumption of fraudulent intent:

> (2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

> (a) The transfer or obligation was to an insider.

> (b) The debtor retained possession or control of the property transferred after the transfer.

> (c) The transfer or obligation was disclosed or concealed.

> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

> (e) The transfer was of substantially all the debtor's assets.

> (f) The debtor absconded.

> (g) The debtor removed or concealed assets.

> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105 (2).

42.    "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud." General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1498 (11th Cir.1997) (citing Johnson v. Dowell, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992)).

17

43.     The UFTA also contains a constructive fraud provision. Section 726.106 of the

UFTA states that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was made or the obligation
> was incurred if the debtor made the transfer or incurred the obligation
> without receiving a reasonably equivalent value in exchange for the
> transfer or obligation and the debtor was insolvent at that time or the
> debtor became insolvent as a result of the transfer or obligation.
>
> (2) A transfer made by a debtor is fraudulent as to a creditor whose claim
> arose before the transfer was made if the transfer was made to an insider
> for an antecedent debt, the debtor was insolvent at that time, and the
> insider had reasonable cause to believe that the debtor was insolvent.

Fla. Stat. § 726.106.

44.     The purpose behind section 726.106(2)  "is that the insider cannot accept

payment for an antecedent debt when the debtor is insolvent, unless other creditors are

paid first." Mansolillo v. Parties By Lynn, Inc., 753 So. 2d 637, 639 (Fla. 3d DCA 2000).

45.     The term "claim" is broadly defined by the UFTA to mean "a right to payment,

whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured." Fla. Stat. § 726.102(3).

46.     The term "creditor" refers to any person who has a claim. Fla. Stat. § 726.102(4).

47.     Broward Marine was a creditor of Double Eagle under the UFTA at the time

Double Eagle made payments to Burrell, MFG and Mr. Zink. See also Friedman v.

Heart Institute of Port St. Lucie, Inc., 863 So. 2d 189, 192 (Fla. 2003) ( noting that it "is

universally accepted, as well as settled in Florida [that a] claim under the [Fraudulent

Transfer] Act may be maintained even though contingent and not yet reduced to

judgment.") (citation and internal quotation marks omitted); Money v. Powell, 139 So.

18

2d 702, 703 (Fla. 2d DCA 1962) (noting that "[i]n this state contingent creditors . . . are as fully protected against fraudulent transfers as holders of absolute claims.").

48.     The term "insider" with respect to a corporation is defined by the UFTA to include a director, officer, person or a relative of the same.  Fla. Stat. § 726.102(7)(b). It also includes "affiliates," or an insider of an affiliate as if the affiliate were the debtor, under subsection 726.102(7)(d).

49.     The term  "affiliate" is defined to include a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds, with power to vote, 20 percent or more of the outstanding voting securities of the debtor."  Section 726.102(1)(b), Fla. Stat.

50.     Here, Mr. Straub was the controlling shareholder of Double Eagle, Burrell and MFG. Accordingly, Burrell and MFG are affiliates of Double Eagle and insiders under the UFTA.

51.     Insolvency is defined by section 726.103, Florida Statutes, as follows:

> (1) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (2) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.
>
>         *      *      *
>
> (4) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under ss. 726.101726.112.

Fla. Stat. § 726.103.

52.    Double Eagle was insolvent at the time it made transfers to Burrell, MFG and Mr. Zink. Double Eagle's 2006 and 2007 tax returns reflected loans from shareholders in the amount of $4.69 million, among other liabilities, and reported total assets of $0 for those years.  Fla. Stat. § 726.103(1).

**Payment from Double Eagle to Burrell**

53.    Double Eagle made the $68,763.40 payment to Burrell "[w]ith actual intent to hinder, delay or defraud" Broward Marine. Fla. Stat. § 726.105(1)(a).

54.    The Court finds that several badges of fraud are present in the instant case supporting the Court's conclusion that Double Eagle possessed the actual intent to defraud Broward Marine.

55.    The transfer was to an insider. Mr. Straub is the controlling shareholder of both Double Eagle and Burrell.

56.    Before the transfer was made, Double Eagle had been sued by Broward Marine.

57.    The transfer was made just one day after the entry of the final judgment in the instant action and Double Eagle knew it would be subject to a future costs judgment.

58.    The transfer was of all of Double Eagle's assets at the time it was made. In fact, the transfer cleared Double Eagle's bank account.

59.    Double Eagle was insolvent at the time of the transfer.

60.    Based upon these badges of fraud, the Court finds that Double Eagle transferred the $68,763.40 payment to Burrell with the actual intent to hinder, delay, or defraud its creditors under § 726.105(1)(a).

61.    The Court further finds that the $68,763.40 transfer was a fraudulent conveyance under section 726.106(2).

62.     Broward Marine's claim, as defined by the UFTA, arose before the transfer was made to Burrell on February 16, 2006.

63.     The transfer was to an insider for an antecedent debt.

64.     At a time of the transfer, Double Eagle was insolvent.

65.     Burrell, an entity controlled by Mr. Straub, "has reasonable cause to believe" that Double Eagle was insolvent.

**Payment from Double Eagle to MFG**

66.     The $173,994.21 transfer from Mr. Zink's trust account to MFG at the direction of Mr. Straub was made with the actual intent to hinder, delay or defraud Broward Marine in violation of Fla. Stat. § 726.105 (1)(a).

67.     MFG is an insider corporation. Like Double Eagle, MFG is owned and controlled by Mr. Straub.

68.     Before the transfer was made Double Eagle had been sued by Broward Marine.

69.     At the time it made the transfer, Double Eagle knew that it would be subject to a costs judgment.

70.     Double Eagle was insolvent when the transfer was made. Fla. Stat. § 726.103(1).

71.     Based upon these badges of fraud, the Court finds that Double Eagle transferred the  $173,994.21 payment to MFGl with the actual intent to hinder, delay, or defraud its creditors under § 726.105(1)(a).

72.     The Court further finds that the $173,994.21 transfer was a fraudulent conveyance under section 726.106(2).

73.     Broward Marine's claim, as defined by the UFTA, arose before the transfer was

made to MFG on March 20, 2007.

74.    The transfer was to an insider for an antecedent debt.

75.    At a time of the transfer, Double Eagle was insolvent.

76.    MFG, an entity controlled by Mr. Straub, "has reasonable cause to believe" that Double Eagle was insolvent.

**Payment from Double Eagle to Larry Zink**

77.    The $72,500 transfer from Mr. Zink's trust account to the Ohio law firm of Tzangas, Plakas, Mannos & Raies at the direction of Mr. Straub was made with the actual intent to hinder, delay or defraud Broward Marine in violation of Fla. Stat. § 726.105 (1)(a).

78.    Before the transfer was made Double Eagle had been sued by Broward Marine.

79.    At the time it made the transfer, Double Eagle knew that it would be subject to a costs judgment.

80.    Double Eagle was insolvent when the transfer was made. Fla. Stat. § 726.103(1).

81.    Double Eagle was not a party to the Ohio law suit and received no consideration in exchange for the $72,500 payment.

82.    Based upon these badges of fraud, the Court finds that Double Eagle transferred the  $72,500 payment to the Ohio law firm with the actual intent to hinder, delay, or defraud its creditors under § 726.105(1)(a).

83.    The Court further finds that the $72,500 transfer was a fraudulent conveyance under section 726.106(1).

84.    Broward Marine's claim, as defined by the UFTA, arose before the transfer was

22

made to the Ohio law firm in October 2006.

85.     Mr. Straub directed the $72,500 transfer from Mr. Zink's trust account to the Ohio

law firm without Double Eagle receiving a reasonably equivalent value in exchange for

the transfer.[6] Double Eagle was not a party to the Ohio lawsuit.

86.     At a time of the transfer, Double Eagle was insolvent. Fla. Stat. § 726.103(1).

**Liability of Glenn Straub**

87.     The Court has found that Mr. Straub is the alter ego of Burrell.

88.     Mr. Staub is personally liable to Broward Marine for the value of the fraudulent

transfer to Burrell.  See Fla. Stat. § 726.109 (2) ("[A] creditor may recover judgment for

the value of the asset transferred. . . or the amount necessary to satisfy the creditor's

claim, whichever is less.").

## FINAL CONCLUSIONS

Based on the above findings of fact and conclusions of law, the Court finds that:

1.     The Supplemental Defendant Burrell Industries, Inc.'s Motion to Dismiss

Complaint in Proceedings Supplementary for Lack of Personal Jurisdiction (DE# 138,

6/3/09) is **DENIED**.

2.     The supplemental plaintiffs, BMI Investment Group, LLC and BME Investment

Group, LLC, are entitled to judgment in their favor against the supplemental

defendants, Marina Funding Group, Inc., Burrell Industries, Inc., Larry A. Zink and

Glenn F. Straub.

---

[6] The $72,500 was not payment for Mr. Zink's legal services. Mr. Zink was paid an hourly rate of $185 for his work in the state court action. There was no contingency fee agreement and Mr. Zink was not entitled to the payment of additional funds.

3.      Accordingly, the supplemental plaintiffs are entitled to recover the full amount of

the costs judgment (DE# 117) in the amount of $67,302.77, plus interest from February

15, 2006 at the rate of 4.6% (28 U.S.C. § 1961), from the supplemental defendants,

jointly and severally.

4.      Final Judgment will be entered by separate order, in accordance with Fed. R.

Civ. P. 58.

        DONE AND ORDERED in Chambers at Miami, Florida, this **1st** day of February,

2010.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel of record